

```
         FILED
    U.S. DISTRICT COURT
   DISTRICT OF MARYLAND

   2013 DEC 13  PM 5:00

      CLERK'S OFFICE
       AT BALTIMORE
BY___NM___ DEPUTY
```

*Harry M. Gruber*
Assistant United States Attorney
Harry.Gruber@usdoj.gov

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*

Suite 400
36 S. Charles Street
Baltimore, MD 21201-3119

DIRECT: 410-209-4835
MAIN: 410-209-4800
FAX: 410-962-3091

December 5, 2013

Law Offices of Gerald C. Ruter, P.C.
9411 Philadelphia Road, Suite O
Baltimore, Maryland 21237

Re:   United States v. Kiran Dewan
      Criminal No. WDQ-12-400

Dear Mr. Ruter:

This letter, together with the Sealed Supplement, confirms the plea agreement which has been offered to the Defendant by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have him execute it in the spaces provided below. If this offer has not been accepted by **December 6, 2013**, it will be deemed withdrawn. The terms of the agreement are as follows:

### Offense of Conviction

1.   The Defendant agrees to plead guilty to Count Three of the Superseding Indictment currently pending against the Defendant, which charges the Defendant with Bribery, in violation of Title 18 U.S.C. § 201(b)(1)(B). The Defendant admits that he is, in fact, guilty of this offense and will so advise the Court.

### Elements of the Offense

2.   The elements of the offense to which the Defendant has agreed to plead guilty, and which the Government would prove if the case went to trial are as follows:

First, that the Defendant offered, promised, or gave money or something else of value;

Second, that the recipient of the money or thing of value offered, promised, or given by the Defendant was a public official, or an individual the Defendant believed to be a public official; and

Third, that the Defendant did so with the corrupt intent to influence an official act.

## Penalties

3. The maximum sentence provided by statute for the offense to which the Defendant is pleading guilty is as follows: a maximum sentence of fifteen (15) years imprisonment, a fine of not more than $250,000, and a term of supervised release of up to three (3) years. In addition, the Defendant must pay $100.00 as a special assessment pursuant to 18 U.S.C. § 3013, which will be due and should be paid at or before the time of sentencing. This Court may also order him to make restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.[1] If a fine or restitution is imposed, it shall be payable immediately, unless, pursuant to 18 U.S.C. § 3572(d), the Court orders otherwise. The Defendant understands that if he serves a term of imprisonment, is released on supervised release, and then violates the conditions of his supervised release, his supervised release could be revoked - even on the last day of the term - and the Defendant could be returned to custody to serve another period of incarceration and a new term of supervised release. The Defendant understands that the Bureau of Prisons has sole discretion in designating the institution at which the Defendant will serve any term of imprisonment imposed.

## Waiver of Rights

4. The Defendant understands that by entering into this agreement, he surrenders certain rights as outlined below:

    a. If the Defendant had persisted in his plea of not guilty, he would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

    b. If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

    c. If the Defendant went to trial, the government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in his defense, however, he would have the subpoena power of the Court to compel the witnesses to attend.

---

[1] Pursuant to 18 U.S.C. § 3612, if the Court imposes a fine in excess of $2,500 that remains unpaid 15 days after it is imposed, the Defendant shall be charged interest on that fine, unless the Court modifies the interest payment in accordance with 18 U.S.C. § 3612(f)(3).

2

     d.     The Defendant would have the right to testify in his own defense if he so chose, and he would have the right to refuse to testify. If he chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from his decision not to testify.

     e.     If the Defendant were found guilty after a trial, he would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges against him. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

     f.     By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that he may have to answer the Court's questions both about the rights he is giving up and about the facts of his case. Any statements the Defendant makes during such a hearing would not be admissible against him during a trial except in a criminal proceeding for perjury or false statement.

     g.     If the Court accepts the Defendant's plea of guilty, there will be no further trial or proceeding of any kind, and the Court will find him guilty.

     h.     By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status. The Defendant recognizes that if he/she is not a citizen of the United States, pleading guilty may have consequences with respect to his/her immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including his/her attorney or the Court, can predict with certainty the effect of a conviction on immigration status. Defendant nevertheless affirms that he/she wants to plead guilty regardless of any potential immigration consequences.

## Advisory Sentencing Guidelines Apply

5.     The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551-3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

### Factual and Advisory Guidelines Stipulation

6.   This Office and the Defendant understand, agree and stipulate to the Statement of Facts set forth in Attachment A, which this Office would prove beyond a reasonable doubt, and to the following applicable sentencing guidelines factors and adjustments:

### Guideline Stipulation

a.   The parties stipulate and agree that U.S.S.G. §2C1.1(a)(2) applies to the Defendant's offense, resulting in a base offense level of twelve (12). The parties further stipulate and agree that the base offense level should be increased as follows:

  (i) by two (2) levels, pursuant to § 2C1.1(b)(1), because the offense involved more than one bribe or extortion;

  (ii) by ten (10) levels, pursuant to § 2C1.1(b)(2) and § 2B1.1, because the value of the bribe payments exceeded $120,000; and

  (iii) by four (4) levels, pursuant to § 3B1.1(a), because the Defendant was an organizer of a criminal activity that involved five or more participants or was otherwise extensive.

The parties stipulate and agree that this results in an adjusted offense level of twenty-eight (28).

b.   This Office does not oppose a two-level reduction in the Defendant's adjusted offense level, based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for his criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional one-level decrease in recognition of the Defendant's timely notification of his intention to plead guilty. This Office may oppose *any* adjustment for acceptance of responsibility if the Defendant (a) fails to admit each and every item in the factual stipulation; (b) denies involvement in the offense; (c) gives conflicting statements about his involvement in the offense; (d) is untruthful with the Court, this Office, or the United States Probation Office; (e) obstructs or attempts to obstruct justice prior to sentencing; (f) engages in any criminal conduct between the date of this agreement and the date of sentencing; or (g) attempts to withdraw his plea of guilty.

7.   The Defendant understands that there is no agreement as to his criminal history or criminal history category, and that his criminal history could alter his offense level if he is a career offender or if the instant offense was a part of a pattern of criminal conduct from which he derived a substantial portion of his income.

8.   This Office and the Defendant agree that with respect to the calculation of the advisory guidelines range, no other offense characteristics, sentencing guidelines factors,

4

potential departures or adjustments set forth in the United States Sentencing Guidelines will be raised or are in dispute.

### 18 U.S.C. Section 3553(a)

9. This Office and the Defendant agree that both parties reserve the right to argue that this Court should sentence the Defendant to a variant sentence outside of the advisory guidelines range determined by the Court. This Office and the Defendant stipulate and agree that if either party intends to argue, pursuant to 18 U.S.C. Section 3553(a), that the sentence in this case should fall outside of the advisory guidelines range based on any factor, that party will notify opposing counsel at least 14 days in advance of sentencing of the facts or issues the party intends to raise. If the party seeking the non-guideline sentence fails to provide timely notice of the intent to argue for a sentence outside the advisory guidelines range, that party will withdraw the 3553(a) arguments or consent to a continuance of the sentencing date.

### All Relevant Information May Be Brought To The Court's Attention

10. At the time of sentencing, the parties reserve the right to bring to the Court's attention at the time of sentencing, and the Court will be entitled to consider, all relevant information concerning the Defendant's background, character and conduct, including the conduct that is the subject of counts of the Indictment that this Office has agreed to dismiss at sentencing.

### Forfeiture

11. The defendant understands that the Court will, upon acceptance of his guilty plea, enter an order of forfeiture as part of his sentence, and that the order of forfeiture may include assets directly traceable to his offense, substitute assets and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offense. Specifically, the Court will order the forfeiture of all property constituting, derived from, or traceable to the gross proceeds obtained directly or indirectly as a result of this offense, including but not limited to $50,000. The Defendant agrees to consent to the entry of orders of forfeiture for such property and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding the forfeiture at the change-of-plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. The Defendant and the Government agree that it may be necessary for the Court to make a factual determination regarding the amount of the money judgment and/or the forfeiture of certain assets. To the extent that it is not possible for the Court to make that determination prior to the date of sentencing, the Defendant agrees to waive any right he may have to have the forfeiture determined at that time, and agrees that the Court may make any necessary factual determination in a post-sentencing proceeding, and may amend the order of forfeiture and the judgment to include the forfeited property at that time.

### Assisting the Government with Regard to the Forfeiture

12. The Defendant agrees to assist fully in the forfeiture of the foregoing assets. The Defendant agrees to disclose all of his assets and sources of income to the United States, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including but not limited to executing any and all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are not sold, disbursed, wasted, hidden or otherwise made unavailable for forfeiture. The Defendant further agrees that he will not assist any third party in asserting a claim to the forfeited assets in an ancillary proceeding and that he will testify truthfully in any such proceeding.

### Waiver of Further Review of Forfeiture

13. The Defendant further agrees to waive all constitutional, legal and equitable challenges (including direct appeal, habeas corpus, or any other means) to any forfeiture carried out in accordance with this Plea Agreement on any grounds, including that the forfeiture constitutes an excessive fine or punishment. The Defendant also agrees not to challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this agreement, and will not assist any third party with regard to such challenges or review or with regard to the filing of a petition for remission of forfeiture.

### Collection of Financial Obligations

15. The Defendant expressly authorizes the U.S. Attorney's Office to obtain a credit report in order to evaluate the Defendant's ability to satisfy any financial obligation imposed by the Court. In order to facilitate the collection of financial obligations to be imposed in connection with this prosecution, the Defendant agrees to disclose fully all assets in which the Defendant has any interest or over which the Defendant exercises control, directly or indirectly, including those held by a spouse, nominee or other third party. The Defendant will promptly submit a completed financial statement to the United States Attorney's Office, in a form this Office prescribes and as it directs. The Defendant promises that the financial statement and disclosures will be complete, accurate and truthful, and understands that any willful falsehood on the financial statement will be a separate crime and may be punished under 18 U.S.C. § 1001 by an additional five years' incarceration and fine.

### Waiver of Appeal

16. In exchange for the concessions made by this Office and the Defendant in this plea agreement, this Office and the Defendant waive their rights to appeal as follows:

a. The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291, or otherwise, to appeal the Defendant's conviction;

b. The Defendant and this Office knowingly waive all right, pursuant to 18 U.S.C. § 3742 or otherwise, to appeal whatever sentence is imposed (including the right to appeal any issues that relate to the establishment of the advisory guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and the decision whether to impose and the calculation of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows: (i) the Defendant reserves the right to appeal any term of imprisonment to the extent that it exceeds 71 months imprisonment; (ii) and this Office reserves the right to appeal any term of imprisonment to the extent that it is below 57 months imprisonment.

c. Nothing in this agreement shall be construed to prevent the Defendant or this Office from invoking the provisions of Federal Rule of Criminal Procedure 35(a), or from appealing from any decision thereunder, should a sentence be imposed that resulted from arithmetical, technical, or other clear error.

d. The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

### Obstruction or Other Violations of Law

17. The Defendant agrees that he will not commit any offense in violation of federal, state or local law between the date of this agreement and his sentencing in this case. In the event that the Defendant (i) engages in conduct after the date of this agreement which would justify a finding of obstruction of justice under U.S.S.G. § 3C1.1, or (ii) fails to accept personal responsibility for his conduct by failing to acknowledge his guilt to the probation officer who prepares the Presentence Report, or (iii) commits any offense in violation of federal, state or local law, then this Office will be relieved of its obligations to the Defendant as reflected in this agreement. Specifically, this Office will be free to argue sentencing guidelines factors other than those stipulated in this agreement, and it will also be free to make sentencing recommendations other than those set out in this agreement. As with any alleged breach of this agreement, this Office will bear the burden of convincing the Court of the Defendant's obstructive or unlawful behavior and/or failure to acknowledge personal responsibility by a preponderance of the evidence. The Defendant acknowledges that he may not withdraw his guilty plea because this Office is relieved of its obligations under the agreement pursuant to this paragraph.

### Court Not a Party

18. The Defendant expressly understands that the Court is not a party to this agreement. In the federal system, the sentence to be imposed is within the sole discretion of the Court. In particular, the Defendant understands that neither the United States Probation Office nor the Court is bound by the stipulation set forth above, and that the Court will, with the aid of the Presentence Report, determine the facts relevant to sentencing. The Defendant understands that the Court cannot rely exclusively upon the stipulation in ascertaining the factors relevant to the determination of sentence. Rather, in determining the factual basis for the sentence, the Court will consider the stipulation, together with the results of the presentence investigation, and any other relevant information. The Defendant understands that the Court is under no obligation to accept this Office's recommendations, and the Court has the power to impose a sentence up to and including the statutory maximum stated above. The Defendant understands that if the Court ascertains factors different from those contained in the stipulation set forth above, or if the Court should impose any sentence up to the maximum established by statute, the Defendant cannot, for that reason alone, withdraw his guilty plea, and will remain bound to fulfill all of his obligations under this agreement. The Defendant understands that neither the prosecutor, his counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

### Entire Agreement

19. This letter supersedes any prior understandings, promises, or conditions between this Office and the Defendant and, together with the Sealed Supplement, constitutes the complete plea agreement in this case. The Defendant acknowledges that there are no other agreements, promises, undertakings or understandings between the Defendant and this Office other than those set forth in this letter and addendum and none will be entered into unless in writing and signed by all parties.

If the Defendant fully accepts each and every term and condition of this letter, please sign and have the Defendant sign the original and return it to me promptly.

Rod J. Rosenstein
United States Attorney

By: _____
Harry M. Gruber
Gregory Bockin
Assistant United States Attorneys

I have read this agreement and carefully reviewed every part of it with my attorney. I understand it, and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney, and I do not wish to change any part of it. I understand this plea agreement, and I voluntarily agree to it. I am completely satisfied with the representation of my attorney.

12-13-13
Date

_____
Kiran Dewan

I am Mr. Dewan's attorney. I have carefully reviewed every part of this agreement with him. To my knowledge, his decision to enter into this agreement is an informed and voluntary one.

12.13.13
Date

_____
Gerald Ruter, Esq.

Case 1:12-cr-00400-WDQ   Document 90   Filed 12/13/13   Page 10 of 13

WDQ12-400

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2013 DEC 13  PM 5:00

CLERK'S OFFICE
AT BALTIMORE
BY _____ DEPUTY

## DEWAN FACTUAL STIPULATION

Background & Overview

From 2011 to May 2013, Defendant Kiran Dewan (hereinafter "Dewan" or "Defendant") was licensed to practice law in the State of Maryland. He operated the Law Offices of Dewan and Associates, P.C., which was located at 7100 Security Boulevard, Windsor Mill, Maryland 21244. He held himself out as an attorney specializing in all aspects of tax compliance, as a certified public accountant with over 15 years of experience, and as an immigration lawyer with experience handling all types of matters, including family visas, Green Cards, and work visas.

During the relevant time periods, the United States Citizenship and Immigration Services ("USCIS") was a component of the United States Department of Homeland Security ("DHS"), and administered many of the immigration and naturalization services previously handled by the U.S. Immigration and Naturalization Service ("INS"). Individuals seeking lawful permanent resident status had to file an Application To Adjust To Lawful Permanent Residence (Form I-485) with USCIS. After an individual filed an application for lawful permanent residence, USCIS issued an Employment Authorization Document (EAD), which permitted the individual to legally work in the United States. When USCIS granted an individual lawful permanent resident status, USCIS issued the individual a Lawful Permanent Resident Card, which is also known as a "Green Card." Individuals who were granted lawful permanent resident status could work in the United States, file additional petitions for immigration benefits for their spouses and family members, and apply for citizenship after meeting certain additional requirements.

In 2011 and 2012, an undercover federal agent (hereinafter "UC1") posed as a public official, that is: a Supervisor acting for and on behalf of USCIS, a branch of the United States Government, in the District of Columbia and Baltimore, Maryland. Dewan and his clients, Amjad Israr ("Israr"), Mohammad Khan ("Khan"), Khazar Nadar ("Nadar"), and Narayan Thapa ("Thapa"), believed that UC1 was a supervisor for USCIS, working in the District of Columbia and Baltimore, Maryland.

Bribery To Obtain Green Cards For Dewan's Clients

From March 2011 to May 2013, the Defendant knowingly and willfully conspired and agreed with multiple clients, including Israr, Khan, Nadar, and Thapa, to bribe UC1, by paying UC1 thousands of dollars to provide Green Cards and other immigration benefits to individuals who were not otherwise entitled to the immigration benefits or documents. Dewan and his clients sought lawful permanent residence status, employment authorization documents, and Green Cards. In furtherance of the conspiracy, Dewan and his clients met at the Law Offices of Dewan and Associates, P.C. At least as to Israr and Khan, Dewan submitted fraudulent immigration forms to UC1. Israr, Khan, Nadar, and Thapa all paid Dewan in cash so he could provide the cash to UC1 in return for UC1's agreement to provide the clients with immigration

1

benefits and documents. Dewan withheld for himself some of the money paid by the clients for the immigration benefits. The UC and Dewan discussed the prices for each applicant, with the UC quoting prices and Dewan and the UC agreeing on the final price.

More specifically, on July 21, 2011, Dewan paid UC1 a $12,000 cash down payment to bribe UC1 to provide immigration benefits and documents for Israr and Khan to which they were not entitled. On August 25, 2011, Dewan, Israr, and Khan met with UC1 at a hotel in White Marsh, Maryland, where UC1 obtained fingerprints and photographs from Israr and Khan. Dewan told UC1 that he had previously spoken with Israr and Khan, and they knew this was not the legitimate way to obtain immigration benefits. On September 13, 2011, Dewan paid UC1 $36,000 in cash for preparing employment authorization documents and lawful permanent resident cards for Israr and Khan. On November 22, 2011, Dewan provided UC1 with an additional $12,000 in cash as a final payment for UC1's assistance in getting immigration benefits for Israr and Khan. The $60,000 in cash Dewan provided to UC1 came from $70,000 in cash Israr and Khan had paid to Dewan. Dewan kept $10,000 of the $70,000 for himself. On January 13, 2012, Dewan received the Green Cards for Israr and Khan from UC1.

In May 2012, Dewan approached UC1 about obtaining immigration benefits and documents for Thapa. Dewan later proposed UC1 help Nadar. In June 2012, Dewan, Nadar, and Thapa met with UC1 in a hotel in White Marsh, Maryland. During the meeting, UC1 took fingerprints from Nadar and Thapa and took their photographs. Dewan revealed to UC1 that he had charged Nadar and Thapa an additional $20,000 each in addition to the $60,000 that UC1 charged for agreeing to provide Nadar and Thapa with immigration benefits.

On July 12, 2012, Dewan agreed to wire $36,000 overseas as payment to UC1 for the immigration benefits and documents (Dewan charged an 8 percent commission for the wire transfer). On July 17, 2012, Dewan wired $36,000 from the attorney trust account for "Law Offices of Dewan and Associates, P.C." to an account in London, England. On October 15, 2012, Dewan provided UC1 with $9,100 as the final payment for the Nadar and Thapa immigration benefits and documents. On December 5, 2012, Dewan received the Green Cards for Nadar and Thapa.

From the $170,000 in cash Dewan's clients provided to Dewan for him to use to bribe UC1 for the immigration benefits, Dewan kept $50,000 and paid $120,000 to UC1.

<u>Bribery Regarding Attempted Removal Of Foreign National #1 From USA & Destruction of USCIS Documents</u>

1. Removal of Foreign National #1

In or about March 2011, Dewan offered UC1 $5,000 to have a foreign national (hereinafter identified as "Foreign National #1") removed from the United States. Dewan asked

for Foreign National #1 to be removed because Dewan was afraid he was going to start his own accounting business and compete with Dewan and because Foreign National #1 knew all of Dewan's clients. Dewan asked for Foreign National #1 to be placed in removal proceedings. Dewan provided UC1 with relevant immigration documents relating to Foreign National #1. In March 2011, Dewan gave UC1 $2,500 as a down payment for Foreign National #1's removal.

As a result of Dewan's bribe, UC1 pretended that UC1 caused USCIS to issue the notice of removal to Foreign National #1, although in reality USCIS already had determined to issue this notice independently of Dewan's actions. In May 2011, based on Dewan's understanding that UC1 had fulfilled his request, Dewan paid UC1 $2,500.

2. Destruction of Records in Foreign National #1's A-File

In September 2011, Dewan asked for UC1's help in altering USCIS files pertaining to Foreign National #1 because Dewan and Foreign National #1 were involved in a financial dispute relating to wages Foreign National #1 claimed Dewan owed. On October 13, 2011, Dewan offered to pay UC1 $5,000 for UC1 to illegally remove documents from Foreign National #1's A-File. Dewan explained to UC1 that Dewan had previously submitted false tax returns to USCIS in support of Foreign National #1's employment visa application. Dewan wanted Dewan's false business tax returns removed from Foreign National #1's A-File, and replaced with new tax returns.

On November 1, 2011 and November 8, 2011, Dewan provided UC1 with copies of documents he wanted removed from Foreign National #1's A-File at USCIS, as well as replacement copies of those documents with different information that Dewan wanted UC1 to insert into Foreign National #1's A-File.

On November 22, 2011, Dewan and UC1 met at a hotel. UC1 provided Dewan with the documents purportedly removed from Foreign National #1's USCIS file and UC1 then shredded the documents in front of Dewan. On December 15, 2011, Dewan provided UC1 with $5,000 cash as payment for UC1's assistance in removing and/or adding documents to Foreign National #1's A-File.

<u>Dewan's Comments To UC1 Regarding Willingness To Illegally Transfer Money Overseas</u>

On February 15, 2012, Dewan met with UC1 and another undercover federal agent (hereinafter "UC2") in Baltimore City, Maryland. During the meeting, Dewan discussed how UC1 and UC2 could use a "Hawala" to transfer illicit proceeds from UC1's illegal receipt of bribes to a foreign country. A Hawala allows an individual to transfer money overseas, using personal connections, without the money going through traditional, government monitored, means like money transfer services or banks. Dewan explained how UC1 could use a Hawala, stating as follows:

3

For a fee, [UC1] could give money to an individual here in the United States, and then another individual involved in the Hawala, who is residing in Dubai, United Arab Emirates ("UAE") for example, would credit an account there without conducting any documented international money wire. For approximately $6,000, [UC1] could set-up a corporation and affiliated bank account in Dubai, UAE, with no direct connections to [UC1's] name. In addition, [UC1] would need a local contact in Dubai, UAE, who would be the signatory on the corporation and bank accounts and conduct money transactions for [UC1]. The money transactions could be monitored and controlled by [UC1] after initially setting-up an internet bank account accessible by password.

Dewan warned UC1 that when using a Hawala, UC1 would need to move the money slowly in intervals to avoid suspicion. Dewan explained that the aforementioned method would get UC1's money overseas, and from that point, UC1 could transfer the money anywhere in the world. Dewan told UC1 that he had previously utilized this Hawala method for other clients and/or associates, and could assist UC1 as well. Dewan stated, "Through my contact, I've never had any problems." Dewan further advised that he had somebody who was doing a "Reverse," in which the individual had money sitting in Dubai, UAE, and subsequently transferred it through the Hawala into the United States.

In May 2012, Dewan again spoke extensively about his knowledge of and interest in establishing a Hawala to transfer UC1's alleged profits from the bribery scheme overseas. Dewan spoke in detail about how this could be accomplished, including using clients of Dewan to facilitate the money transfers and how to avoid detection. Dewan also advised UC1 that he had been involved in bringing $400,000 in from Dubai, UAE, via a Reverse Hawala.

I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney, and I do not wish to change any part of it. I understand it, and I voluntarily agree to it. I am completely satisfied with the representation of my attorney.

_12-13-13_
Date

_[signature]_
Kiran Dewan

4